[Docket No. 1]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

SOPHIA M. SHANNON,

     Plaintiff,

          v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Civil No. 15-6480 (RMB)

**MEMORANDUM ORDER**

**BUMB,** UNITED STATES DISTRICT JUDGE:

    This matter comes before the Court upon the appeal by Plaintiff Sophia M. Shannon (the "Plaintiff") of the final determination of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for social security benefits [Docket No. 1].  For the reasons set forth below, the Court **VACATES** the decision of the Administrative Law Judge (the "ALJ") and **REMANDS** for further proceedings consistent with this Memorandum Order.

    The Court finds as follows:

    1.  Plaintiff applied for social security disability benefits on May 17, 2012, originally alleging an onset date of November 4, 2010 [Administrative Record ("R.") 165-66].  The claim was denied initially on August 30, 2012, and upon reconsideration on April 8, 2013 [R. 126-30, 132-34].  On May

12, 2013, Plaintiff requested a hearing before an ALJ [R. 135].
On or around September 23, 2013, Plaintiff applied for
supplemental security income benefits.  [R. 167].  On April 22,
2014, ALJ Marguerite Toland held a hearing regarding both
applications [R. 59-93].  Plaintiff appeared with her attorney,
Danielle Webb, and provided testimony.  At the hearing,
Plaintiff amended her alleged onset date to March 27, 2012
[R. 63, 190].  Louis P. Szollosy, a vocational expert, also
testified.  The ALJ issued an unfavorable decision on August 29,
2014 in which she found that Plaintiff was not disabled because
she is able to perform her past relevant work [R. 29-51].  On
June 29, 2015, the Appeals Council denied Plaintiff's request
for review of the ALJ's decision [R. 1-7], making the ALJ's
decision the final determination of the Commissioner.

    2.   Plaintiff alleges that she suffers from disabling
wrist and back pain, as a result of two motor vehicle accidents
in 2010 and 2011 and a fall in 2014, as well as depression and
anxiety.  Plaintiff claims that she is forgetful and has
difficulty concentrating, that she requires assistance in nearly
all activities of daily life, and that she is in virtually
constant pain.

    3.   The ALJ found that Plaintiff suffers from the
following severe impairments: "history of injuries sustained in
an motor vehicle [sic] accident including traumatic

chondromalacia of the patella, bilateral carpal tunnel syndrome and cervical[,] thoracic, and lumbar strain, disc herniation at L4-5, hyperextension injuries to the wrist with tear observed in the proximal portion of the left and right scapholunate ligaments with bilateral synovitis, and status post arthroscopic surgery on the left wrist." [R. 31-32].

4.    The ALJ found that Plaintiff's palpitations, goiter, hypertension, right ear deafness, left knee contusion, and depression with anxiety to be non-severe impairments [R. 32].

5.    After considering Listing Levels 1.02 and 1.04, the ALJ found that Plaintiff did not suffer from a listing level impairment [R. 37-38].

6.    The ALJ next determined that Plaintiff had the residual functional capacity ("RFC") "to perform sedentary work . . . except that she can sit up to 6 hours per day but no more than one hour at a time, and then would need to stand/shift positions for 4 to 5 minutes every hour while remaining on task. She can only occasionally stoop.  She can perform no more than frequent handling.  She would be limited to low stress work, defined as not involving a fast production rate pace.  She would be off task 5 percent of the workday in addition to normal breaks." [R. 38].

7.    The ALJ then determined that Plaintiff is able to perform her past relevant work as a dispatcher and receptionist and, therefore, that she is not disabled [R. 51].

8.    The following consists of Plaintiff's medical history.

9.    On November 4, 2010, Plaintiff was in a motor vehicle accident and was taken to the Lourdes Medical Center emergency department [R. 537].  Plaintiff was diagnosed with neck pain, headache, and an abdominal contusion, and prescribed Ibuprofen and Flexeril [R. 542].

10.   On January 11, 2011, Plaintiff was examined by Dr. Keith Preis of Neurology Pain Associates, P.C. upon the referral by Plaintiff's chiropractor Ronald Zweibaum.  Plaintiff reported slight pain when she moves her neck.  Dr. Preis reported "Left occipital nerve tenderness to palpation similar to headache. . . . Positive Spurling's. . . . Positive Tinel's left elbow and bilateral wrists.  Positive left Phalen's. . . . Gait and station: Slightly widened, mildly stooped. . . . unsteady tandem gait, positive Romberg a little to the left, better with arms extended.  Decreased bending and squat.  There is lumbar tenderness to palpation.  Bilateral Lasegue's.  Left straight leg raising.  Bilateral knee tenderness."  Dr. Preis also opined that "[i]t is clear that this patient's symptoms are related to the motor vehicle accident of 11/4/2010 within a reasonable degree of medical certainty."  [R. 287].

4

11.  On January 21, 2011, Dr. Satish Chandra, a radiologist, interpreted an MRI of Plaintiff's cervical spine and found that "[t]here is a straightening of the cervical spine.  The vertebral heights are maintained.  The disc hydration is intact.  The neural foramina are patent.  There is no evidence of disc bulge or herniation."  [R. 289].

12.  On March 15, 2011, Plaintiff was examined by Dr. Preis, who once again decreased range of motion and tenderness and noted "Positive left Tinel's at the elbow and wrist.  Positive left Phalen's.  Lumbar tenderness to palpation.  Bilateral Lasegue's.  Left straight leg raising.  Unsteady tandem gait. . . . Bilateral knee tenderness.  Mild Romberg to the left."  Dr. Preis reviewed a January 20, 2011 MRI of the cervical spine, which revealed straightening secondary to spasm. A January 20, 2011 MRI of the lumbar spine revealed disc bulging at L4-5 and straightening secondary to spasm.  [R. 284].

13.  On April 14, 2011, Plaintiff visited Dr. Preis. Plaintiff reported that she was taking Cymbalta, which reduced the number and severity of her headaches and pain.  Dr. Preis again reported tenderness and positive Tinel's, Phalen's, Lasegue's, and straight leg raising test results.  Dr. Preis also reported that an "MRI of cervical spine revealed a few bulges" and that an "MRI of the lumbar spine revealed left L5 bulge."  [R. 282].

14.   On May 3, 2011, Dr. Lawrence Barr of Garden State Orthopaedics examined Plaintiff, who had been referred to him by her chiropractor, Mr. Ronald Zweibaum.  Plaintiff reported being in a motor vehicle accident in November 2010 and suffering from tingling in her arms, pain in her knees, headaches, and decreased hearing in her right ear since the accident. Examinations of Plaintiff's cervical spine, wrists, thoracic spine, and lumbosacral spine all revealed tenderness.  Dr. Barr examined Plaintiff's January 20, 2011 MRI, which showed a bulging disc at L4-5.  The MRI of Plaintiff's cervical spine showed straightening.  [R. 298-99].

15.   On May 12, 2011, Plaintiff visited Dr. Preis for a follow up.  Dr. Preis noted an increase in pain and numbness in Plaintiff's legs and decreased hearing in her right ear. Dr. Preis reported "bilateral occipital nerve tenderness to palpation similar to headache. . . . Lumbar tenderness to palpation.  Left straight leg raising.  Bilateral Lasegue's. Bilateral SI joint tenderness. . . . Bilateral Tinel's at the elbows and left wrist. . . . Mild left antalgic component to the gait worse with toe and heel walking.  Bilateral knee tenderness to palpation, left greater than right."  Dr. Preis also reported that Plaintiff was taking Cymbalta, Voltaren gel, Topamax, Flexeril, and Percocet.  [R. 281].

16.  On June 6, 2011, Dr. Neil Kramer of South Jersey
Radiology Associates, P.A. examined an X-ray of Plaintiffs'
knees, which showed no fracture [R. 304].  Dr. Kramer also
reviewed X-rays of Plaintiff's wrists, which also showed no
fractures.  Dr. Kramer noted "[s]oft tissue fullness dorsal to
the left wrist." [R. 305].

17.  On June 22, 2011, Plaintiff visited Dr. Barr and
reported neck, mid and low back pain, wrist pain, and numbness
and tingling in her arms and legs.  Dr. Barr reported that
Plaintiff's "[r]ange of motion of the cervical spine was
restricted to 80% of normal in all planes of motion.  Tenderness
and spasm were present in the paraspinal muscles and both
trapezii."  Plaintiff's wrists showed ulnar tenderness.  Her
thoracic spine revealed tenderness and spasm.  Plaintiff's
lumbosacral spine revealed tenderness.  Straight leg raising was
negative.  Dr. Barr noted that X-rays of her knee and wrists
were normal. [R. 295-96].

18.  On July 28, 2011, Dr. Chandra reviewed an MRI of
Plaintiff's right wrist, which showed a "full-thickness tear of
the scapholunate ligament," a "small distal radioulnar and
carpal joint effusion," and "extensor synovitis." [R. 302].
Dr. Chandra also reviewed an MRI of Plaintiff's left wrist,
which showed "extensive soft tissue swelling of the left wrist"

7

and "a tear of the proximal portion of the scapholunate ligament." [R. 303].

19.   On August 8, 2011, Dr. Barr examined Plaintiff and noted that she continued to complain of neck, back, wrist, and knee pain.  Dr. Barr reported that an MRI of Plaintiff's "right wrist showed a torn scapholunate ligament, distal radial ulnar and carpal joint effusion, synovitis of the extensor digitorum and extensor carpi radialis."  An "MRI of the left wrist showed swelling over the forearm and a tear of the scapholunate ligament," but no fracture.  Likewise, X-rays of Plaintiff's knees showed no fracture.  [R. 293].  Dr. Barr noted that if Plaintiff's "symptomatology does not improve, she may ultimately need surgical evaluation of her hands." [R. 294].

20.   On November 7, 2011, Plaintiff presented at the Cooper University Hospital emergency department after she was hit by a bus.  Plaintiff reported leg pain, but was able to ambulate. The records indicate that Plaintiff exhibited tenderness in her cervical and lumbar backs. [R. 533-34].

21.   Cooper University Hospital emergency department records dated November 23, 2011 note that Plaintiff complained of mid-lower back and left knee pain [R. 527].

22.   On December 28, 2011, Plaintiff was evaluated by chiropractor Ronald Zweibaum following an incident on November 7, 2011 when Plaintiff was hit by a bus.  Mr. Zweibaum noted

positive test results for Jacksons Compression for Nerve Root
Compression, Shoulder Depression for Radicular Pain, Soto Hall
for Vertebral Trauma, Foramina Compression Testing, Goldthwaits
Test, and Kemps Test.  Mr. Zweibaum also reported decreased
range of motion.  [R. 344-45].  Mr. Zweibaum's diagnosis was
lumbar intervertebral disc disorder, hip sprain/strain, lumbar
sprain/strain, cervical sprain/strain, thoracic sprain, wrist
sprain/strain, and knee injury [R. 346].  However, he opined
that "it is too early to determine whether this patient will
have any residuals of permanent disability." [R. 347].

23.  Plaintiff presented at the Virtua Health emergency
department on January 4, 2012 for evaluation of ongoing chest
pain [R. 363].  The emergency department notes report paraspinal
tenderness in her left upper back area [R. 364].

24.  On January 5, 2012, Plaintiff presented at the Lourdes
Medical Center emergency department with complaints of abdominal
and back pain [R. 516].  She was diagnosed with an ovarian cyst
and abdominal pain, and prescribed Naprosyn and Percocet
[R. 519].

25.  On January 16, 2012, Dr. Barr examined Plaintiff.  He
noted that Plaintiff had been hit by a bus on November 7, 2011
and that she reported neck, low back, left knee, and wrist pain.
[R. 342].  Dr. Barr noted "positive Tinel's and Phalen's",
dorsoradial tenderness in both wrists, and tenderness in the

9

thoracic and lumbosacral spines and knees.  Dr. Barr referred
Plaintiff for X-rays of her cervical, thoracic, and lumbar
spines, as well as her knees and wrists, and for an evaluation
by a hand surgeon.  [R. 342-43].

26.  On February 6, 2012, Dr. Elliot Ames of New Jersey
Hand Center examined Plaintiff, who was referred to him by Dr.
Barr.  Dr. Ames noted that an MRI of Plaintiff's wrists reported
torn scapholunate ligament.  Dr. Ames also recommended
arthroscopy of Plaintiff's left wrist "since this is the more
symptomatic side."  [R. 312-13].

27.  A February 8, 2012 MRI of Plaintiff's cervical spine
indicated kyphosis of the cervical spine, which Dr. Siddharth
Prakash opined "may be secondary to spasm," and no disc bulge or
herniation [R. 325].  An MRI of the lumbar spine revealed
"[l]eft foraminal disc herniation at L4-L5 indenting upon the
left lateral recess and descending left L5 nerve root."
[R. 327].  An MRI of the thoracic spine showed no acute osseous
pathology or disc herniation [R. 328].

28.  On March 12, 2012, Dr. Ames examined Plaintiff, who
requested to proceed with arthroscopy of the left wrist.
Dr. Ames scheduled Plaintiff for surgery on her left wrist on
March 27, 2012.  [R. 311].

29.  On March 27, 2012, Dr. Ames performed an operative
arthroscopy on Plaintiff's left wrist [R. 324].

30.  On April 2, 2012, Plaintiff was evaluated by Ms. Andria Williams, P.A.-C at State Neurodiagnostics & Pain Management, LLC.  Ms. Williams noted that Plaintiff was seeing a chiropractor "with benefit" and that she was taking Percocet, Flexeril, and Ibuprofen "with benefit."  Plaintiff reported pain in her mid back, neck, low back, left arm, left hand, left hip, and left leg.  Ms. Williams noted tenderness in Plaintiff's cervical and thoracic spines, spasm in her lumbar spine, and tenderness in her left wrist and hip.  She also noted that "[s]ensory testing of the upper extremities displays decreased sensation of the C6 and C7 nerve root distributions bilaterally."  Ms. Williams opined that "patient is a candidate for interventional pain management treatment" and that "patient has lower extremity radicular symptoms and neurological examination reveals positive findings."  [R. 339-40].

31.  Plaintiff presented at the Virtua Health emergency department on April 5, 2012 with complaints of palpitations [R. 376].

32.  On April 11, 2012, Dr. Ames examined Plaintiff after her left wrist surgery.  Plaintiff reported pain and numbness in her left hand.  Dr. Ames noted that Plaintiff's incisions were well-healed, that there was no swelling, and that her digital range of motion was full.  [R. 301].

33.  On April 18, 2012, Plaintiff was seen at the Virtua
Health emergency department for low back pain [R. 395].  The
emergency department notes report paraspinal tenderness in the
left lower back area and pain with straight leg raise on the
left side [R. 396].

34.  On April 27, 2012, Plaintiff was examined by Dr. David
Smith of State Neurodiagnostics & Pain Management, LLC.  She
reported "low back pain and exacerbation of bilateral lower
extremity radicular pains, and parasthesias."  Dr. Smith found
evidence of L5 radiculopathy on the right and left and evidence
of S1 radiculopathy on the left.  [R. 317].

35.  On May 7, 2012, Plaintiff was examined by Dr. Jeffrey
Selk and Dr. John Mahoney of State Neurodiagnostics & Pain
Management, LLC, who reported that Plaintiff walked with "a mild
antalgic gait independently" and that "[t]here was a sensory
deficit along the dermatomes of L4 and L5 bilaterally.  Straight
leg raising was positive bilaterally."  [R. 321].  Dr. Selk
reported that an MRI of Plaintiff's lumbar spine "revealed a
disc herniation at L4-L5 indenting upon the left lateral recess
and descending left L5 nerve root."  Dr. Selk recommended
additional lumbar epidural steroid injections.  [R. 322].

36.  On May 14, 2012, Dr. Ames reported that Plaintiff was
doing well after the operative arthroscopy of her left wrist.
He noted that Plaintiff's range of motion of her left wrist had

12

improved by 10 degrees and that her grip strength had improved since the operation.  Dr. Ames noted that "Ms. Shannon has had an excellent result following surgery.  Return to work regular duty will be as of tomorrow.  No other treatment is necessary referable to the left wrist."  [R. 300].

37.  On May 18, 2012, Dr. Emanuel Lamprou examined Plaintiff and noted "4 Metacarpal/Phalangeal JT; + tender . . . Painful flexion."  [R. 334].

38.  On May 19, 2012, Plaintiff was seen at the Virtua Health emergency department, where she was diagnosed with goiter and dysphasia [R. 407].  Plaintiff also reported constant pain [R. 413].

39.  On May 23, 2012, Plaintiff underwent an L5-S1 lumbar epidural steroid injection by Dr. Selk [R. 316].

40.  Plaintiff completed a Work Activity Report on May 25, 2012, in which Plaintiff claimed that she is "unable to work due to [her] herniated disc in [her] L4-L5 and nerve damage" [R. 198].  She reported that injections in her lower back made the pain worse and that she is unable to stand or sit for long periods of time due to pain shooting down both her legs and feet [R. 198].

41.  On June 9, 2012, Plaintiff completed a Function Report form in which she described her daily activities.  She noted that her oldest daughter cleans and cooks for her [R. 221].

Plaintiff also noted that she is unable to lay on her back for more than an hour without turning over.  She explained that her daughter assists her with getting dressed, shaving her legs, and taking her to and from the bathroom [R. 222].  She reported that she can only walk for ten to fifteen minutes without resting and stand for only thirty minutes at a time [R. 226].

42.  On June 13, 2012, Plaintiff was examined by Dr. Agathe Franck.  Plaintiff reported that her pain was a 7 out of 10 in intensity and that the pain "radiat[ed] down to both legs with numbness/tingling sensation in both feet."  [R. 486]. Dr. Franck's examination revealed lumbar/lumbosacral spine abnormalities.  Plaintiff had positive straight leg raising test results.  Dr. Franck found that Plaintiff suffered from bulging lumbar disc and peripheral neuropathy.  [R. 487-88].

43.  On July 10, 2012, Plaintiff was examined by Dr. Lamprou who noted herniation at L4-5 and herniated cervical disc disease [R. 332].

44.  On August 23, 2012, Dr. Richard Band examined Plaintiff.  Plaintiff reported lower back pain and bilateral wrist pain.  [R. 632].

45.  On September 20, 2012, Dr. Band evaluated Plaintiff again.  Plaintiff reported that her pain was a 10 out of 10 in intensity.  Dr. Band found that she suffered from chronic neck and low back pain.  [R. 472].

46.  On October 3, 2012, Plaintiff presented at the Virtua Health emergency department, where she was diagnosed with abdominal pain and menorrhagia [R. 431].

47.  On October 17, 2012, Plaintiff visited Dr. Band, who found that Plaintiff suffered from chronic low back pain and lumbar radiculopathy.  [R. 471].

48.  On October 31, 2012, Plaintiff submitted a Disability Report form, in which she noted that she is unable to walk without a cane.  She also reported that she suffers from "acute pain" and that her "hand stiffens because of the nerve damage." [R. 229].

49.  On November 14, 2012, Plaintiff was examined by Dr. Band, who noted chronic lower back pain and lumbar radiculopathy [R. 470].

50.  On November 21, 2012, Plaintiff was examined at the Virtua Health emergency department.  She was diagnosed with back pain and peripheral neuropathy [R. 453].

51.  On December 12, 2012, Dr. Band examined Plaintiff. Plaintiff reported pain in her legs, left wrist, and neck. Dr. Band noted chronic neck and lower back pain and cervical and lumbar radiculopathy.  [R. 469].  Dr. Band prescribed Plaintiff Oxycodone and referred her for an EMG of her left upper extremity.  [R. 627].

52.   On January 9, 2013, Dr. Band examined Plaintiff and noted chronic neck and lower back pain [R. 468].

53.   On January 23, 2013, Plaintiff submitted an additional Function Report form.  She reported needing assistance getting dressed, bathing, using the bathroom, and cutting food [R. 238-39].  Plaintiff also stated that her medications make her "dizzy and numb" and that she is unable to concentrate due to her pain [R. 240].  Additionally, she reported using a splint and cane, which were prescribed by doctors in June 2011 and June 2012 respectively [R. 243].

54.   On February 20, 2013, Plaintiff was evaluated at the Virtua Health emergency department.  She was diagnosed with pelvic/hip pain [R. 640].

55.   On March 6, 2013, Plaintiff was examined by Dr. Band, who noted that she had no side effects from Oxycodone and that she was benefiting from the medication.  He noted tenderness and that Plaintiff reported having recently fallen in her bathtub at home.  [R. 467].

56.   On March 22, 2013, Dr. Band completed a General Medical Report for Plaintiff.  Dr. Band noted decreased range of motion in Plaintiff's cervical spine and disc herniation at L4-5 [R. 464].  Dr. Band did not opine on Plaintiff's ability to do work related activities [R. 465].

57.  On April 30, 2013, Plaintiff visited Dr. Band, complaining of lower back and pelvic pain.  Dr. Band reported that Plaintiff suffered from chronic lower back pain, left hip pain, and pelvic pain.  [R. 621].

58.  On May 15, 2013, Plaintiff completed an additional Disability Report form, in which she described being "unable to keep objects in [her] hands without [her] dropping them."  She also reported that her legs go numb and that she suffers from sharp pain down her legs and feet [R. 245].  Plaintiff noted that she cannot stand for more than ten minutes [R. 249].

59.  On May 28, 2013, Dr. Band examined Plaintiff.  His notes report "painful ROM" and "chronic LBP".  [R. 620].

60.  On June 12, 2013, Dr. Franck examined Plaintiff regarding complaints of body pain.  Dr. Franck noted that Plaintiff requested that she complete a disability form on her behalf because "her pain management doctor would not fill it out for her."  Dr. Franck noted that Plaintiff "has disc bulging in neck and back and has been seeing pain meds, got injections w/o relief.  Had surgery in left wrist due to carpal tunnel and also torn ligament.  Pt unable to sit or stand for long period of time due to pain, also states that she has been dropping things in her hands."  [R. 489].

61.  Also on June 12, 2013, Dr. Franck completed a Multiple Impairment Questionnaire regarding Plaintiff's impairments.

Dr. Franck diagnosed Plaintiff with chronic back pain, disc
bulging L4-L5, and hip/pelvic pain.  She noted that Plaintiff's
prognosis is "stable".  [R. 477].  Dr. Franck reported that
Plaintiff's MRI confirms disc herniation at L4-L5 [R. 478].  Dr.
Franck opined that Plaintiff can sit, stand, and walk for no
more than one hour each in an eight-hour day.  She found that it
is necessary or medically recommended for Plaintiff not to sit,
stand, or walk continuously in a work setting.  [R. 479-80].
Dr. Franck further opined that Plaintiff can never lift or carry
any weight and that Plaintiff has significant limitations in
repetitive reaching, handling, fingering, or lifting due to
carpal tunnel and torn ligaments in her wrists.  Specifically,
she found that Plaintiff had marked difficulty grasping,
turning, and twisting objects with her right hand and moderate
difficulty with her left.  She found no limitations to
Plaintiff's ability to use her fingers and hands for fine
manipulations.  Dr. Franck also noted that Plaintiff has
moderate limitations in her ability to use her arms for
reaching.  [R. 480-81].  She found that Plaintiff was incapable
of even low stress work and that Plaintiff would likely have to
take fifteen to thirty minute unscheduled breaks every two to
three hours at work.  [R. 482].  In Dr. Franck's opinion,
Plaintiff would likely have to be absent for work as a result of
her impairments more than three times per month.  [R. 483].

62.  On June 23, 2013, Plaintiff was examined at the Virtua Health emergency department [R. 602].  She was diagnosed with arthralgia in the knee [R. 624], and prescribed Percocet [R. 603].

63.  On June 25, 2013, Dr. Band examined Plaintiff and reported that she suffered from chronic lower back pain [R. 619].

64.  On August 26, 2013, Dr. Franck evaluated Plaintiff, whose chief complaint was depression and anxiety.  Plaintiff reported decreased energy and concentration.  Dr. Franck noted that Plaintiff suffered from lower back pain, bulging lumbar disc, peripheral neuropathy, and depression with anxiety. [R. 496-97].

65.  On September 16, 2013, Dr. Jeffry Simon evaluated Plaintiff.  Dr. Simon reported chronic lower back, knee, and hip pain [R. 617].

66.  On November 13, 2013, Plaintiff visited Dr. Raul Valcarel of Monroe Medical Associates to refill her prescriptions for Oxycodone and OxyContin.  Plaintiff reported that her request for a follow-up MRI had been denied by her insurance company.  [R. 502].

67.  On December 6, 2013, Plaintiff was evaluated by Dr. Franck for back, hip, and wrist pain [R. 492].  Dr. Franck found that Plaintiff suffered from wrist joint pain, lower back pain,

bulging lumbar disc, peripheral neuropathy, and depression with anxiety. [R. 493-94].

68.   On December 13, 2013, Plaintiff visited Dr. Valcarel to refill her prescriptions for Oxycodone and OxyContin. Plaintiff had no new complaints and reported that her pain was "tolerable 4 out of 10." [R. 501].

69.   On January 13, 2014, Plaintiff was examined at Monroe Medical Associates.  Plaintiff had no new complaints and reported doing well.  Her prescriptions for Oxycodone and OxyContin were refilled. [R. 500].

70.   On January 22, 2014, Dr. Franck noted that Plaintiff reports that "her pain has been constant to the point that she is unable to perform her activities of daily living." Dr. Franck also reported that an "MRI of the L-S spine reveals L4-L5 disc herniation indenting upon the left lateral recess and descending left L5 nerve root."  She also noted that Plaintiff reported feeling depressed and requiring assistance getting out of bed, cooking, and cleaning.  In Dr. Franck's opinion, Plaintiff cannot work full-time.  [R. 485].

71.   On February 12, 2014, Plaintiff was examined by Dr. Valcarel.  Plaintiff reported that her pain was tolerable with medication, but that her fingers in both hands were numb and that she had pain in her lower back.  The medical notes report "chronic pain syndrome . . . likely neuropathy."

Plaintiff's prescriptions for Oxycodone and OxyContin were refilled. [R. 499].

72.   On March 12, 2014, Plaintiff visited Dr. Valcarel to refill her Oxycodone prescription.  Plaintiff also reported falling in February.  The notes from her visit state that her Oxycodone dosage was not increased because she was already taking the maximum dose.  The notes also state "Drug screen. Will check NJPMP."  [R. 498].

73.   On April 16, 2015, Dr. Midnon Dguerra completed a Disability Impairment Questionnaire on behalf of the Plaintiff, in which Dr. Dguerra noted Plaintiff's diagnoses as cervicalgia, lumbar radiculopathy, left hip pain, depression, and anxiety [R. 8].  Dr. Dguerra saw Plaintiff three times between September and December 2014.  Dr. Dguerra noted that Plaintiff's pain is precipitated and/or aggravated by prolonged standing, sitting, bending, and lifting [R. 9].  In Dr. Dguerra's opinion, Plaintiff can sit, stand, and walk for less than one hour each during an eight-hour workday.  Plaintiff can only sit for fifteen minutes at a time and will need to take unscheduled breaks every thirty minutes [R. 10-11].

74.   At the hearing before the ALJ on April 22, 2014, both the Plaintiff and Mr. Szollosy, the vocational expert, testified [R. 59-93].

75.   Plaintiff testified that she is largely confined to the ground floor of her home because she is in too much pain to climb stairs and that she has not driven due to her impairments since March 2012 [R. 65]. Plaintiff also testified that her past relevant work includes jobs as a receptionist, a cashier, and a dispatcher [R. 66-69]. She explained that she was in a motor vehicle accident in 2010 that resulted in injuries to her back, knees, wrist, and neck [R. 70]. Plaintiff was also hit by a bus in November 2011 [R. 70-71]. She testified that she has used a cane since that accident [R. 74]. She explained that she lays in bed or on the couch most of the day and often must switch sides because her legs and arms go numb [R. 75-76]. Plaintiff testified that she does not socialize or have any hobbies [R. 77]. She reported that her medications make her drowsy and unable to concentrate [R. 79]. Plaintiff testified that her oldest daughter helps her get dressed in the morning and has missed many days of school to help her at home [R. 80-81]. She explained that she is only able to sit for fifteen to twenty minutes before she must get up due to her pain [R. 82].

76.   Mr. Szollosy, the vocational expert, also testified at the ALJ hearing [R. 85-92]. Mr. Szollosy testified that a hypothetical individual with Plaintiff's RFC would be able to perform Plaintiff's past relevant work as a dispatcher and receptionist, either as Plaintiff actually performed those jobs

22

or as they are described in the Dictionary of Occupational Titles [R. 87-88]. He also testified that, if this hypothetical individual was limited to no more than occasional handling, as opposed to frequent handling, that individual would be precluded from performing any of Plaintiff's past relevant work [R. 89]. Additionally, Mr. Szollosy testified that an individual who is off-task ten percent or more on an ongoing basis would be precluded from around ninety-nine percent of occupations, but an individual who is off-task only five percent of the workday would be able to perform Plaintiff's past relevant work as a dispatcher or receptionist [R. 89].

77. The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v). Here, the ALJ determined that Plaintiff was able to perform her past relevant work as a dispatcher and receptionist and, accordingly, concluded that Plaintiff was not disabled at the fourth step of this analysis.

78. A reviewing court must uphold the Commissioner of Social Security's factual findings if they are supported by "substantial evidence," even if the court would have decided the inquiry differently. 42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means

"'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Cons. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  Where the evidence is susceptible to "more than one rational interpretation, the Commissioner's conclusion must be upheld." Ahearn v. Comm'r, 165 F. App'x 212, 215 (3d Cir. 2006) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

79.  If faced with conflicting evidence, however, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F. 2d 581 (3d Cir. 1986)).  Stated differently, "unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [she] has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)) (internal quotations omitted); see also Guerrero v. Comm'r, 2006 WL

1722356, at *3 (D.N.J. June 19, 2006) ("The ALJ's responsibility is to analyze all the evidence and to provide adequate explanations when disregarding portions of it."), aff'd, 249 F. App'x 289 (3d Cir. 2007).

80.   While the Commissioner's decision need not discuss "every tidbit of evidence included in the record," Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004), it must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections," Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000); see also Fargnoli, 247 F.3d at 42 ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.").

81.   In addition to the "substantial evidence" inquiry, the reviewing court must also determine whether the ALJ applied the correct legal standards.  See Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).  The Court's review of legal issues is plenary. Sykes, 228 F.3d at 262 (citing Schaudeck v. Comm'r, 181 F.3d 429, 431 (3d Cir. 1999)).

82.  The Court will address each of Plaintiff's arguments on appeal in turn.

83.  Plaintiff first argues that the ALJ erred in assigning little weight to Plaintiff's treating physician, Dr. Agathe Franck.  Plaintiff's Brief ("Pl. Br.") at 12-18 [Docket No. 8].

84.  Specifically, Plaintiff contends that the ALJ's decision to assign little weight to Dr. Franck's opinions because Dr. Franck relied largely on Plaintiff's subjective complaints is not supported by substantial evidence.  Plaintiff argues that Dr. Franck's opinions were actually based primarily upon clinical medical evidence, such as MRI results, not merely Plaintiff's subjective complaints.  Pl. Br. at 14.  Plaintiff also claims that the ALJ impermissibly relied upon "her own credibility judgments, speculation or lay opinion."  Id. (quoting Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000)).

85.  Additionally, Plaintiff argues that the ALJ improperly discounted Dr. Franck's opinions as reserved to the Commissioner.  Id. at 15.  She also contends that the ALJ improperly discounted Dr. Franck's opinions as inconsistent with the record as a whole without adequately addressing what in the record was inconsistent with Dr. Franck's opinions.  Finally, Plaintiff argues that the ALJ did not address all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927, as required by SSR 96-2p in evaluating Dr. Franck's opinions.  Id. at 17.

Instead, in Plaintiff's view, the ALJ improperly placed "undue weight on a single factor by repeatedly noting that Dr. Franck is not a specialist in occupational medicine or in neurology or orthopedics." Id. (citing [R. 50-51]).

86.   The Commissioner, in turn, argues that the ALJ properly assigned little weight to Dr. Franck's opinions "for several legitimate reasons – namely, that her opinions were inconsistent with the record, that she lacked expertise in vocational training and occupational health, and that she was not a specialist in orthopedics or neurology," and because Dr. Franck relied heavily on Plaintiff's subjective complaints, which the ALJ had discounted.  The Commissioner also contends that the ALJ properly rejected Dr. Franck's opinions as to Plaintiff's disability as reserved to the Commissioner. Commissioner's Brief ("Comm. Br.") at 13-14 [Docket No. 11].  In response to Plaintiff's position that the ALJ did not address all of the required regulatory factors, the Commissioner argues that "there is no requirement that the ALJ articulate each one [of the regulatory factors]."  Comm. Br. at 14 (emphasis in original) (citing Sollien v. Colvin, 2014 WL 1012515, at *5 (N.D. Tex. Mar. 14, 2014)).

87.   The ALJ summarized Dr. Franck's opinions as follows: "Agathe Franck, M.D., concluded on June 12, 2013 that the claimant could never lift weight (Exhibit 8F).  Dr. Franck

concluded that the claimant could sit for up to 1 hour in an
8 hour day and stand or walk for up to 1 hour in an 8 hour day,
she was markedly limited from grasping[,] turning[,] and
twisting objects with her right arm and moderately limited in
her left arm, she was moderately limited in using her bilateral
arms for reaching and not limited in her ability to perform fine
manipulation.  She could not keep her neck in a constant
position.  Her pain would constantly interfere with her ability
to pay attention and concentrate.  She was incapable of low
stress work.  She needed work breaks every two to three hours
for 15 to 30 minutes.  She would be absent for more than three
times a month.  She could not perform any pushing, pulling,
kneeling, bending or stooping.  Dr. Franck concluded on January
22, 2014 that the claimant could not work full time
(Exhibit 9F)."  [R. 50].

88.  The ALJ "assign[ed] little weight to Dr. Franck's
opinions (Exhibits 8F and 9F)."  The ALJ "[found] Dr. Franck's
conclusions to be inconsistent with the record and determine[d]
that Dr. Franck's lack of expertise in vocational training and
occupational health coupled with her specialty in internal
medicine has not provided a balanced review of the claimant's
limitations.  Dr. Franck's assessment that the claimant does not
have a capacity for work is given little weight because the
totality of the medical evidence shows that the claimant is not

as limited as determined by Dr. Franck.  The record suggests
that Dr. Franck, who does not have a specialization in
orthopedics or neurology, relied heavily on the claimant's
subjective complaints regarding her physical impairments to
guide the completion of her opinion.  Further, regardless of
Dr. Franck's conclusions about the claimant's disabled status,
opinions regarding a claimant's ability to work are
administrative findings and as such are reserved to the
Commissioner (SSR 96-5p)."  [R. 50-51].

89.  "An ALJ should give treating physicians' reports great
weight, especially when their opinions reflect expert judgment
based on a continuing observation of the patient's condition
over a prolonged period of time.  The ALJ is not permitted to
make speculative inferences from medical reports, nor can she
employ her own expertise against that of a physician who
presents competent expert evidence.  Contradictory medical
evidence is required for an ALJ to reject a treating physician's
opinion outright.  Where the evidence conflicts, the ALJ may
choose whom to credit, but she cannot reject evidence for no
reason or for the wrong reason.  To the contrary, she must
consider all the evidence and give some reason for discounting
that which she rejects." Masher v. Astrue, 354 F. App'x 623,
627 (3d Cir. 2009) (internal citations, quotations, alterations
omitted).

29

90.   Additionally, pursuant to SSR 96-2p, if the ALJ finds that the treating source's opinion is not well-supported, that "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 CFR 404.1527 and 416.927."  These factors include the examining relationship, the treatment relationship (the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship), supportability, consistency, and specialization.  See 20 C.F.R. § 404.1527(c)(1)-(5).

91.   Here, the ALJ stated that she found "Dr. Franck's conclusions to be inconsistent with the record." [R. 50].  She did not explain which of Dr. Franck's opinions were inconsistent with record or how they were inconsistent.  Further, the ALJ did not identify what evidence in the record contradicted Dr. Franck's opinions.  Instead, the ALJ simply found that Dr. Franck's opinions regarding the extent and nature of Plaintiff's limitations were inconsistent with the "the totality of the medical evidence." [R. 51].  The ALJ also assigned little weight to Dr. Franck's opinions because Dr. Franck "relied heavily on the claimant's subjective complaints regarding her physical impairments to guide the completion of

30

her opinion" and because Dr. Franck gave conclusions as to Plaintiff's disabled status, which is an ultimate issue reserved to the Commissioner.  [R. 51].

92.  The Court finds that the ALJ's decision to assign little weight to Dr. Franck's opinions is not supported by substantial evidence.  The Court first notes that, while Dr. Franck relied on Plaintiff's subjective complaints, Dr. Franck also relied upon clinical findings and objective medical evidence, such as a positive results on straight leg raise tests and MRI results.  See, e.g., [R. 478] (noting that Plaintiff's MRI, which reveals disc herniation at L4-L5, supports Dr. Franck's diagnosis); [R. 485] (relying upon both Plaintiff's subjective complaints of pain and her MRI that "reveals L4-L5 disc herniation indenting upon the left lateral recess and descending left L5 nerve root"); [R. 487-88] (noting that "Neurodynamic tests of the lumbosacral spine were performed," which showed "abnormalities" in Plaintiff's "Lumbar/lumbosacral spine," and positive straight leg raise test).  The ALJ did not evaluate Dr. Franck's opinions to the extent they rely upon objective medical evidence.  On remand, the ALJ should do so.

93.  More importantly, the Court reiterates that the ALJ is required to "review all of the pertinent medical evidence" and "explain[] [her] conciliations and rejections."  Burnett, 220

F.3d at 122.  Furthermore, "the ALJ may choose whom to credit, but she cannot reject evidence for no reason or for the wrong reason" and "must consider all the evidence and give some reason for discounting that which she rejects."  Masher, 354 F. App'x at 627 (internal citations, quotations, and alterations omitted).  The ALJ did not identify the medical evidence in the record that she found contradicted Dr. Franck's opinions. Likewise, the ALJ's evaluation of the factors set forth in 20 C.F.R. § 404.1527(c) was not "accompanied by a clear and satisfactory explication of the basis on which it rests." Buckley v. Astrue, 2010 WL 3035746, at *9 (D.N.J. Aug. 3, 2010) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

94.  "Where there is conflicting probative evidence in the record," the Third Circuit has "recognize[d] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."  Fargnoli, 247 F.3d at 42. Accordingly, the Court will remand to the ALJ to reevaluate Dr. Franck's opinions in light of this Court's Memorandum Order. The Court does not make any findings as to the weight that should be given to Dr. Franck's opinions.  Rather, the Court simply directs the ALJ to evaluate Dr. Franck's opinions according to the applicable regulations and relevant factors and

to fully set forth her reasons for assigning whatever weight she deems appropriate to Dr. Franck's opinions.

95.   The Court also notes that while an ALJ is not required to "give any special significance to the source of an opinion on issues reserved to the Commissioner," Buckley, 2010 WL 3035746, at *9 (quoting 20 C.F.R. § 404.1527(e)(2)-(3)), "[t]he mere utterance of the word 'disabled' does not make a physician's opinion 'conclusory.' . . . Rather than focusing on the doctor's choice of words, the ALJ was obligated to examine the substantive evidence on which the physician's conclusion was based." Masher, 354 F. App'x at 628 (citing Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008)).  To the extent that the ALJ chooses to reject Dr. Franck's conclusions regarding Plaintiff's disabled status, the ALJ may do so since the question of disability is properly reserved for the Commissioner.  However, Dr. Franck's medical opinions that underlie her conclusions regarding disability must be properly evaluated by the ALJ on remand.

96.   Next, Plaintiff argues that the ALJ "simply concluded that Ms. Shannon can perform a limited range of sedentary work" without "provid[ing] any support for this conclusion," in violation of SSR 96-8p.  Pl. Br. at 18.  Plaintiff contends that the ALJ "failed to cite to any specific medical facts to support the physical RFC found for Ms. Shannon as required by the

33

Commissioner's binding Ruling." Id. (emphasis in original).
Instead, in Plaintiff's view, the ALJ "impermissibly interpreted
the raw medical data into the RFC determination for Plaintiff,"
which is "strictly disallowed." Id. at 18-19 (citing Doak v.
Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested
that the activity Doak could perform was consistent with the
definition of light work set forth in the regulations, and
therefore the ALJ's conclusion that he could is not supported by
substantial evidence.")).

97.   The Commissioner, in turn, contends that "the ALJ
carefully analyzed and weighed the evidence and fully accounted
for her credibly established limitations in assessing her RFC."
Comm. Br. at 15.   The Commissioner points to the ALJ's
discussion and consideration of the Plaintiff's testimony, the
diagnostic test results, notes from Plaintiff's emergency room
visits, and the medical opinions of Plaintiff's doctors,
including Dr. Ames, Dr. Franck, and the state agency medical
consultant. Id. at 15-16.   In the Commissioner's view, the ALJ
accounted for Plaintiff's carpal tunnel syndrome, right and left
ligament tears, and pain and discomfort by assigning certain
manipulative and postural limitations and the sit/stand option.
Id. at 16.

98.   As the Court has already noted, the ALJ limited
Plaintiff to sedentary work, but further limited her to sitting

34

only up to six hours per day and no more than one hour at a
time.  The RFC notes that Plaintiff would need to stand or shift
positions for four to five minutes every hour while remaining on
task.  The ALJ further found that Plaintiff can only
occasionally stoop and can perform no more than frequent
handling.  The ALJ further limited Plaintiff to low stress work
and found that she would be off-task only five percent of the
workday.  [R. 38].

99.  In support of the handling limitations in the RFC, the
ALJ noted that, "although the claimant exhibited a positive
Tinel's and Phalen's sign in January 2012, she underwent no EMG
and nerve conduction study to determine whether she had carpal
tunnel syndrome. . . . The claimant was not referred for carpal
tunnel surgery and was not provided with splints for her
bilateral wrists, a normal conservative treatment practice.  The
undersigned concludes that due to the absence of treatment for
her bilateral carpal tunnel syndrome, the claimant has not
established the most she can do despite her severe impairments.
. . . The undersigned assigned handling limitations to consider
her carpal tunnel syndrome."  [R. 48].

100. The ALJ "assigned lifting and handling limitations in
the claimant's residual functional capacity as assigned to
consider her" right ligament tear in her wrist.  [R. 48-49].
The ALJ noted that Plaintiff's "imaging study confirmed the

35

presence of a right ligament tear in July 2011" but that she "underwent little treatment for the impairment during the period at issue" and that "[a]lthough the claimant indicated in December 2013 that she could not undergo surgery due to transportation issues, there is no indication in the medical record as a whole that she was ever referred for surgery for the condition." [R. 48-49].

101. The ALJ next addressed the medical record and Plaintiff's alleged symptoms as they relate to the left ligament tear in Plaintiff's left wrist.  The ALJ noted that she underwent surgery in March 2012 to repair the tear in her left wrist and that Dr. Ames reported that Plaintiff "achieved excellent results following the surgery." [R. 49]. Nevertheless, the ALJ explained that, "[t]o consider any residuals arising from her left wrist surgery, which have not been quantified through objective means after May 2012, the undersigned assigned a sedentary level of exertion and additional manipulative limitations." [R. 49].

102. Finally, the ALJ "conclude[d] that the absence of objective evidence in this case in conjunction with the claimant's reported elevated pain levels, which mirror complaints of those individuals having significantly more pathology in their imaging studies, objective evaluations, and lab test results, casts doubt on the claimant's testimony.

Therefore, the credibility of the claimant's testimony about the extent and severity of her impairment, in the face of such findings, has been reduced accordingly." Based on this, the ALJ "[found] that the claimant experiences some pain and discomfort from her severe impairments; however, not to the extent maintained by the claimant. Instead, the undersigned concludes that the claimant is able to perform work related activities at a sedentary exertional level with a sit/stand option and manipulative and postural limitations. The undersigned assigned low stress work with being off task 5 percent of the workday in addition to normal breaks to consider the claimant's subjective complaints of pain and medications side effects. As a result, the objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the claimant's residual functional capacity as assigned." [R. 49].

103. Pursuant to SSR 96-8p, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . . The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."

Additionally, an ALJ's determination should not be based on her own speculation or lay opinion.  See Morales v. Apfel, 225 F.3d 310, 317, 319 (3d Cir. 2000).

104. Moreover, in accordance with SSR 96-7p, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. . . . The explanations provided by the individual may provide insight into the individual's credibility.  For example: . . . The individual may be unable to afford treatment and may not have access to free or low-cost medical services."  See also Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003).

105. Insofar as the RFC restricts Plaintiff to a limited range of low stress sedentary work that involves sitting for up to six hours in an eight-hour workday while being off task no more than 5% of the time, the Court agrees with the Plaintiff that the ALJ has not provided any support from the record for these conclusions.  The ALJ found that the Plaintiff "is able to perform work related activities at a sedentary exertional level" and assigned Plaintiff to "low stress work with being off task 5 percent of the workday."  [R. 49].  Yet, the ALJ provided no

38

medical or other evidence to support the conclusions that Plaintiff can sit for up to six hours per day with breaks, can handle low stress work, and would only be off task five percent of the workday.  Therefore, these conclusions are not supported by substantial evidence.

106. Furthermore, while the ALJ evaluated the medical evidence and Plaintiff's reports of pain and other impairments in assigning handling, manipulative, and postural limitations, the ALJ also improperly inserted her lay opinion into this analysis.  For example, the ALJ concluded, based on what can only be her own lay interpretation of the medical evidence, that Plaintiff's "reported elevated pain levels . . . mirror complaints of those individuals having significantly more pathology in their imaging studies, objective evaluations, and lab results." [R. 49].  Based in part on this lay opinion, the ALJ did not include further restrictions in Plaintiff's RFC. Finally, contravening SSR 96-7p, the ALJ made "inferences about [Plaintiff's] symptoms and their functional effects" based on her failure to undergo an EMG or nerve conduction study to verify the extent of her carpal tunnel syndrome, without addressing Plaintiff's proffered reason regarding her insured status. [R. 48].  The ALJ also appears to have questioned Dr. Band's diagnosis, noting, presumably in her own lay opinion, that, "[a]lthough Dr. Band concluded that the claimant had

39

cervical radiculopathy, he did not consider that the claimant's numbness may have been arising from her carpal tunnel syndrome or that her imaging study in February 2012 reflected no disc herniation or other pathology that could cause such symptoms." [R. 47].  The Court reiterates that it is not for the ALJ to interpret the raw medical data or substitute her own lay opinions for those of a medical expert.

107.  This Court "should not 'supply a reasoned basis for the agency's action that the agency itself has not given.'" Gross v. Comm'r Soc. Sec., -- F. App'x --, 2016 WL 3553259, at *4 (3d Cir. June 30, 2016) (quoting Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 305 (3d Cir. 2013)).  For this reason, the Third Circuit "requires the ALJ to set forth the reasons for [her] decision." Id. (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119 (3d Cir. 2000).  Accordingly, the Court finds that remand is appropriate for the ALJ to reconsider the RFC determination and to provide adequate support for that determination, consistent with the applicable regulations and this Order.

108.  Finally, Plaintiff argues that the ALJ failed to properly evaluate her credibility.  Accordingly, in Plaintiff's view, the ALJ's determination that Plaintiff's subjective complaints regarding the intensity of her symptoms were not

entirely credible is not supported by substantial evidence.
Pl. Br. at 19-21.

109. Specifically, Plaintiff argues that the ALJ
impermissibly substituted her own interpretation of the medical
evidence in finding that the medical record did not support the
severity of Plaintiff's subjective complaints.  Plaintiff argues
that "a claimant's allegations cannot be rejected simply
'because the available objective medical evidence does not
substantiate [the claimant's] statements.'"  Id. at 20 (quoting
20 C.F.R. §§ 404.1529, 416.929(c)(2)).

110. Additionally, Plaintiff contends that the ALJ
improperly determined that the lack of a recent MRI of the spine
indicated that the Plaintiff's symptoms were not as severe as
she claims.  In Plaintiff's view, the ALJ should have considered
Plaintiff's inability to afford such a treatment before making
this determination, in accordance with SSR 96-7p, which requires
the ALJ to consider a claimant's explanation for failing to seek
or pursue medical treatment before drawing inferences about the
person's symptoms.

111. The Commissioner responds by explaining that the ALJ
compared Plaintiff's reported symptoms to her medical record and
properly determined that her subjective complaints were not
entirely credible.  The Commissioner also contends that the ALJ
made no statement that could support Plaintiff's argument that

the ALJ improperly "used her inability to afford treatment
against her in finding her not entirely credible."  Comm. Br.
18-19.

112. The ALJ found that "the claimant's medically
determinable impairments could reasonably be expected to cause
the alleged symptoms; however, the claimant's statements
concerning the intensity, persistence and limiting effects of
these symptoms are not entirely credible for the reasons
explained in this decision." [R. 39].  The ALJ continued, "In
this instance, a number of the claimant's impairments could
reasonably cause some symptomatology.  However, the pivotal
question is not whether such symptoms exist, but whether those
symptoms occur with such frequency, duration or severity as to
reduce the claimant's residual functional capacity or to
preclude all work activity on a continuing and regular basis.
In this case, a careful review of the record does not document
sufficient objective medical evidence to substantiate the
severity of the pain and degree of functional limitations
alleged by the claimant." [R. 46].

113. In comparing Plaintiff's subjective complaints of pain
and impairments, the ALJ concluded, for example "that her
chondromalacia of the patella affects the claimant's ability to
perform work related activities but not to the extent alleged by
the claimant due to the absence of treatment for the condition

42

after the amended onset date or any indication that her impairment worsened." [R. 46].

114. The ALJ also compared Plaintiff's complaints of back numbness and pain to the objective medical evidence, noting that "[a]lthough Dr. Band concluded that the claimant had cervical radiculopathy, he did not consider that the claimant's numbness may have been arising from her carpal tunnel syndrome or that her imaging in February 2012 reflected no disc herniations or other pathology that could cause such symptoms. Further, although Dr. Band ordered an EMG and nerve conduction study to confirm the presence of cervical radiculopathy, there is no evidence in the medical record as a whole that the claimant ever underwent the procedure to confirm a cervical radiculopathy diagnosis. . . . The undersigned finds no objective evidence to support a conclusion that her cervical strain was disabling." [R. 47]. The ALJ then noted that Plaintiff was referred to an orthopedist for her pain, "but there is no indication that the claimant ever followed through with this treatment suggestion. Instead, she changed pain management doctors in November 2013." [R. 48]. For these reasons, the ALJ discounted Plaintiff's subjective complaints of cervical spine pain and numbness.

115. In assessing Plaintiff's recent complaints of pain, the ALJ noted that "[t]here is no indication that [Dr. Valcarel] raised her medication dosages or that imaging pathology

demonstrated a worsening of her condition because her most recent imaging study occurred in early 2012, more than 2 years prior to the decision date in this case. . . . [Plaintiff] has not established through objective evidence that her lumbar pathology has advanced from 2012 to support a conclusion that her pain levels are above the mild level on a consistent basis based upon objective support for such a conclusion." [R. 48].

116. Then, after describing Plaintiff's medical records at length and comparing the objective medical evidence to Plaintiff's subjective complaints, the ALJ "conclude[d] that the absence of objective evidence in this case in conjunction with the claimant's reported elevated pain levels, which mirror complaints of those individuals having significantly more pathology in their imaging studies, objective evaluations, and lab test results, casts doubt on the claimant's testimony. Therefore, the credibility of the claimant's testimony about the extent and severity of her impairment, in the face of such findings, has been reduced accordingly.  The undersigned finds that the claimant experiences some pain and discomfort from her severe impairments; however, not to the extent maintained by the claimant." [R. 49].

117. "The credibility determinations of an administrative judge are virtually unreviewable on appeal." Hoyman v. Colvin, 606 F. App'x 678, 681 (3d Cir. 2015) (quoting Bieber v. Dep't of

44

the Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).  Therefore, an
ALJ's credibility determination is accorded great deference and
will not be disturbed unless it is "inherently incredible or
patently unreasonable."  See Blue Ridge Erectors v. Occupational
Safety & Heath Review Comm'n, 261 F. App'x 408, 410 (3d Cir.
2008); St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298
(3d Cir. 2005).  Pursuant to SSR 96-7p, the ALJ "must consider
the entire case record and give specific reasons for the weight
given to the individual's statements." SSR 96-7p also "mandates
that the [credibility] 'determination . . . must contain
specific reasons for the finding on credibility, supported by
the evidence in the case record, and must be sufficiently
specific to make clear to . . . any subsequent reviewers the
weight the adjudicator gave to the individual's statements and
the reasons for that weight."  Williams v. Barnhart, 211
F. App'x 101, 105 (3d Cir. 2006) (quoting SSR 96-7p).

118. Furthermore, an individual's subjective reports of the
nature and extent of their symptoms cannot be rejected "solely
because the available objective medical evidence does not
substantiate [the individual's] statements."  20 C.F.R.
404.1529(c)(2).  This recognizes the fact that "symptoms, such
as pain, sometimes suggest a greater severity of impairment that
can be shown by objective medical evidence alone."  SSR 96-7p.

45

For this reason, a plaintiff's statements about symptoms must be carefully considered by the ALJ.   Id.

119.   In considering a plaintiff's subjective reports of symptoms, such as pain, as the Court has already noted, the ALJ should not rely upon her own lay opinion or speculation in making a credibility determination.   See Morales, 225 F.3d at 319.   Likewise, as addressed above, according to SSR 96-7p, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. . . . The explanations provided by the individual may provide insight into the individual's credibility.   For example: . . . The individual may be unable to afford treatment and may not have access to free or low-cost medical services."

120.   The ALJ found the Plaintiff not entirely credible, in part, because Plaintiff's "reported elevated pain levels . . . mirror complaints of those individuals having significantly more pathology in their imaging studies, objective evaluations, and lab results" than Plaintiff does.   [R. 49].   The conclusion appears to be the ALJ's own lay opinion made in light of her experience adjudicating social security disability cases.   As

the Court has already found, this is an example of the ALJ improperly inserting her lay opinion.  The ALJ impermissibly interpreted the medical data herself, rather than relying upon the medical opinions of the physicians who evaluated Plaintiff, in order to make this credibility determination.  Again, the Court notes that "[t]he ALJ is not permitted to make speculative inferences from medical reports, nor can she employ her own expertise against that of a physician who presents competent expert evidence."  Masher, 354 F. App'x at 627.

121. Even if the medical evidence supported the ALJ's conclusion, that conclusion nevertheless contravenes the principles set forth in the applicable regulations.  20 C.F.R. § 404.1529(c)(2) explicitly states that the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements."  Yet, that is exactly what the ALJ did when she found that "the absence of objective evidence in this case in conjunction with the claimant's reported elevated pain levels, which mirror complaints of those individuals having significantly more pathology in their imaging studies, objective evaluations, and lab test results, casts doubt on the claimant's testimony."  [R. 49].

122. The Court also agrees with the Plaintiff that the ALJ improperly considered the lack of a more recent MRI in assessing her credibility.  For example, the ALJ discounted Plaintiff's recent reports of pain, in part, because "[t]here is no indication that [Dr. Valcarel] raised her medication dosages or that imaging pathology demonstrated a worsening of her condition because her most recent imaging study occurred in early 2012, more than 2 years prior to the decision date in this case." [R. 48].  Likewise, the ALJ reasoned that Plaintiff's pain was not as severe as she reported because "[s]he has not established through objective evidence that her lumbar pathology has advanced from 2012 to support a conclusion that her pain levels are above the mild level on a consistent basis." [R. 48].  The ALJ, however, did not consider Plaintiff's proffered inability to afford the additional MRI in light of her insured status, as she was required to do under SSR 96-7p before drawing inferences from Plaintiff's failure to seek the treatment.

123. For these reasons, the Court finds that remand is appropriate for the ALJ to reevaluate her credibility determination in accordance with SSR 96-7p, 20 C.F.R. § 404.1529(c)(2), and this Memorandum Order.  On remand, the ALJ should consider the adequacy of any reasons proffered by the Plaintiff to explain her medical treatment history.

48

ACCORDINGLY, FOR THE REASONS SET FORTH ABOVE, IT IS HEREBY on this **20th** day of **September 2016**,

**ORDERED** that the decision of the Administrative Law Judge is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum Order; and it is further

**ORDERED** that the Clerk of the Court shall **CLOSE** the file in the above-captioned matter.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE